# EXHIBIT B

2013 WL 5933920
Only the Westlaw citation is currently available.
United States District Court,
M.D. Louisiana.

Jerry H. LANDRUM

v.

COSCO (aka Cosco Home
and Office Furniture, a
division of Dorel Industries).

Civil Action No. 11–424–SDD–RLB.
|
Nov. 1, 2013.

**Attorneys and Law Firms**

Aub A. Ward, Naquin & Ward, Baton Rouge, LA, Michael O. Hesse, Hesse and Butterworth, LLC, St. Francisville, LA, for Jerry H. Landrum.

Patrick J. Briney, Briney Foret Corry, LLP, Lafayette, LA, Ann MacDonald, Jonathan Judge, Schiff Hardin LLP, Chicago, IL, for Cosco (aka Cosco Home and Office Furniture, a division of Dorel Industries).

***RULING***

SHELLY D. DICK, District Judge.

**\*1** Before the Court are Defendant's, COSCO Home & Office Products (COSCO), *Motions in Limine No. 3[1], No. 4[2], No. 5[3], No. 6[4], No. 7[5].* The motions are unopposed.

## I. STATEMENT OF FACTS

A summary of the relevant facts in this case has been previously elucidated by this Court in prior *Ruling[6]*.

## II. RELIEF REQUESTED

In its *Motion in Limine No. 3,* Defendant moves to exclude evidence of allegedly similar incidents, lawsuits and complaints. Any evidence of similar incidents is admissible only if shown to be substantially similar to the events in the case

before the Court.[7] The Court is also mindful that evidence of "anecdotal stories and/or internet reports" would constitute inadmissible hearsay. Accordingly, Defendant's *Motion in Limine No. 3[8]* is GRANTED.

In its *Motion in Limine No. 4,* Defendant moves to exclude evidence of chair manufacturing quality and references to manufacturing in China. Insofar as the Court has previously dismissed the Plaintiff's manufacturing defect claim[9], the Court is persuaded that reference to the locale of manufacturing is irrelevant if offered for the purposes of suggesting inferior manufacturing processes. Defendant's *Motion in Limine No. 4[10]* to exclude evidence that the chair was manufactured in China and evidence of the chair manufacturing process is GRANTED, if offered for purposes of proving inferior manufacturing processes.

Defendant's *Motion in Limine No. 5* moves the Court to exclude evidence of recalls or investigations of different products manufactured or sold by COSCO. The Defendant argues that "there were no recalls, investigations, or fines relating to the subject Model 14–716 folding chair." The Court cannot make this factual determination and, therefore, the Defendant's Motion is premature. Thus, Defendant's *Motion in Limine No. 5[11]* is DENIED as premature reserving to the Defendant the opportunity to object to such evidence at trial.

By way of *Motion in Limine No. 6[12]*, the Defendant moves to exclude evidence related to the profit margin on the subject chair. The Court finds the Defendant's *Motion in Limine No. 6* to be premature. Thus, the Court DENIES the motion reserving to the Defendant the opportunity to make objections at the time of trial.

In *Motion in Limine No. 7[13]*, Defendant moves to exclude "evidence of COSCO Home & Office Products' assets or the expense of generating evidence, and certain references to its counsel". Defendant cites no discovery or prior proceedings in this case which would suggest that the Plaintiff intends to offer evidence of COSCO's assets or the expense of generating evidence. The Court hereby DENIES COSCO's *Motion in Limine No. 7* as premature reserving unto COSCO the right to make appropriate objections at trial.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5933920

Footnotes

| | |
|---|---|
| 1 | Rec. Doc. 55. |
| 2 | Rec. Doc. 56. |
| 3 | Rec. Doc. 57. |
| 4 | Rec. Doc. 58. |
| 5 | Rec. Doc. 59. |
| 6 | Rec. Doc. 68. |
| 7 | *Mitchell v. Fruvhauf Corp.,* 568 F.2d 1139, 1147 (5th Cir.1978). |
| 8 | Rec. Doc. 55. |
| 9 | Rec. Doc. 35. |
| 10 | Rec. Doc. 56. |
| 11 | Rec. Doc. 57. |
| 12 | Rec. Doc. 58. |
| 13 | Rec. Doc. 59. |

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

Callahan v. Toys "R" US-Delaware, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 219371

2017 WL 219371
Only the Westlaw citation is currently available.
United States District Court, D. Maryland.

CALLAHAN, et al., Plaintiffs

v.

TOYS "R" US-DELAWARE,

INC., Defendants.

Civil Case No. 15-02815-JMC
|
Signed 01/19/2017

**Attorneys and Law Firms**

Francis J. Collins, Jacqueline S. Togno, Kahn, Smith & Collins, P.A., Baltimore, MD, for Plaintiffs.

Jeffrey David Skinner, Schiff Hardin LLP, Washington, DC, Jonathan Judge, Rachel A. Remke, Schiff Hardin LLP, Chicago, IL, for Defendants.

**MEMORANDUM AND ORDER REGARDING DEFENDANTS' MOTIONS *IN LIMINE***

J. Mark Coulson, United States Magistrate Judge

 **\*1** Plaintiffs, Virginia Callahan and T.G., brought this action against Defendants, Toys "R" US-Delaware, Inc. ("Toys 'R' US") and Pacific Cycle, Inc. ("Pacific"), alleging various counts of strict liability, negligence, and breach of warranty, stemming from an accident involving T.G. and a bicycle that was manufactured, assembled, and sold by Defendants. Plaintiffs' defect theory is based on a manufacturing defect in the minor Plaintiff's bicycle's rear brake, causing it to malfunction. Plaintiffs assert that the defect may have either been present at the time of original manufacture by Pacific Cycle or at the time of final assembly by Toys 'R' US, or both. The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF Nos. 70, 72.) Now pending before the Court is Defendants' combined Motion *in Limine*. (ECF No. 81.) The motion has been fully briefed (ECF Nos. 81, 90, 92), and oral argument on the motion was held on January 17, prior to selecting a jury. For the reasons

that follow, and those stated on the record, Defendant's Motion *in Limine* is GRANTED in part, denied in part, and deferred in part.

"A ruling on a motion *in limine* is no more than a preliminary or advisory opinion that falls entirely within the discretion of the district court." Adams v. NVR Homes, Inc., 141 F. Supp. 2d 554, 558 (D. Md. 2001) (internal citations omitted). "The primary purpose of an *in limine* ruling is to streamline the case for trial and to provide guidance to counsel regarding evidentiary issues." Id

Defendants' motion seeks to exclude evidence that falls into several categories, some of which are conceded by Plaintiffs and are now moot.[1] Those remaining categories of evidence are discussed in the order in which the parties have organized them in their briefs.

*Non-similar accidents, issues, or lawsuits*
Defendants ask this Court to prohibit Plaintiffs from offering evidence of other accidents involving products made and sold by Defendants. Specifically, Defendants seek to exclude seven complaints/reports of brake failures on Defendants' bicycles that Plaintiffs obtained during discovery. While Plaintiffs believe that such evidence is relevant to "Defendants' failure to properly assemble bicycles," Defendants contend that these cases and reports are too dissimilar to be probative of that issue, and are as a result unfairly prejudicial.

"Where a party seeks to introduce evidence of other accidents, [he or she] 'must present a factual foundation for the court to determine that the other accidents were *substantially similar* to the accident at issue.' " Mirchandani v. Home Depot U.S.A., Inc., 470 F. Supp. 2d 579, 583 (D. Md. 2007) (citing Buckman v. Bombardier Corp., 893 F.Supp. 547, 552 (E.D.N.C. 1995)) (emphasis added). "Where a party offers evidence of prior accidents solely to prove notice, however, 'the incidents need only be sufficiently similar to make the defendant aware of the dangerous situation.' " Mirchandani, 470 F. Supp. 2d at 583 (citing Benedi v. McNeil–P.P.C., Inc., 66 F.3d 1378, 1386 (4th Cir. 1995)) (internal brackets omitted).

Callahan v. Toys "R" US-Delaware, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 219371

**\*2** As it relates to the seven specific reports or incidents that were disclosed during discovery, Plaintiffs have not met their burden of showing how these reports are *substantially similar* to the alleged incident at issue in this case. In admitting evidence of prior accidents, it is not enough that those accidents had a similar (albeit unverified) complaint of defect. Rather the proponent admitting the evidence must show how these similar defects were the cause of their respective accidents to the exclusion of other possible factors and causes, such as rider error, misuse, or improper alterations. Buckman v. Bombardier Corp., 893 F. Supp. 547, 552 (E.D.N.C. 1995) ("An offer of evidence of other incidents, to support a claim that the present accident was caused by a defect that also caused the other incidents, requires that the plaintiff establish the following factors: (1) the products are similar; (2) the alleged defect is similar; (3) causation related to the defect in the other incidents; and (4) exclusion of all reasonable secondary explanations for the cause of the other incidents"). These seven reports involve different models of bicycle than the one involved in the present case, and each describes a different brake malfunction than the one alleged here. Moreover, these reports provide no discussion as to the cause of the accidents in those cases, nor do these seven reports implicate Toys "R" US as the assembler or distributor.

Even if, as Plaintiffs request, this evidence would be admitted for purposes of showing notice—and are thus viewed under the more liberal standard of *sufficient similarity*—Plaintiffs have still not done enough to show how these prior instances were relevant. As noted above, none of these seven instances allege the same braking malfunction or even that the braking system was the proximate cause of the accidents in those cases. As a result, these seven incidents/reports are inadmissible.

Finally, these complaints are unverified and, according to Defendants at oral argument, are logged simply for customer service/satisfaction purposes. Such unchallenged and uninvestigated allegations of defect are not sufficient reliable for admission, particularly when balanced against the potential to mislead and confuse the jury, and unfairly prejudice Defendants.

*References to Chinese manufacturing and cost/pricing*

Next, Defendants state that Plaintiffs should be precluded from making any comments or implications that the bicycle was of an inferior quality because it was manufactured in China. "Such commentary on Chinese manufacturing and inferior quality," Defendants warn, "is irrelevant to the issue of whether the product was defective" and it potentially raises issues of ethnic bias. Defendants qualify their request, though, adding that they themselves should be permitted to "offer evidence that the bicycle in question was sold at a reasonable price," and that the price of the bike in question resulted in a certain design and simpler braking system than seen on other, presumably higher priced, models. Plaintiffs, in turn, respond that they will not argue that the product was of inferior quality because it was manufactured to China or that sourcing products in China damages the American economy. But, Plaintiffs note, Defendants should also be precluded from commenting about the relatively low price of the bicycle in question.

To the extent that either party wishes to introduce evidence that bicycle was of inferior quality by virtue of its foreign production, such evidence will not be permitted. However, if the location of manufacture is relevant to Defendant Pacific Cycle's ability to comply with the standard of care applicable to bicycle manufacturers, it will be permitted. For example, if Plaintiffs have evidence that companies manufacturing remotely have certain duties required by the standard of care, such evidence will not be precluded Additionally, evidence regarding the price of the bicycle relevant to its design and manufacturing is permitted if such evidence is probative of the issue of the complexity of the braking system and the accompanying assembly instructions. But arguments that a plaintiff buying a product at a particular price point is entitled to a lesser standard of care or invites a higher likelihood of a manufacturing or assembly issue are not supported by the law and therefore will not be permitted.

**\*3** *Limiting the scope of expert opinion of Kristopher Macalinao*

Defendants seek to limit the testimony of Plaintiffs' expert witness, Kristopher Macalinao. Defendants contend that Mr. Macalinao, a bicycle mechanic and store owner, should not be permitted to testify about the cause of the accident in this case, given that he

Callahan v. Toys "R" US-Delaware, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 219371

has no experience or expertise in the field of accident reconstruction. In their response, Plaintiffs appear to concede that Mr. Macalinao will not testify as to what specifically caused the accident in this case. Rather, Mr. Macalinao, who has inspected the bicycle at issue, intends to testify as to the alleged defect of the braking mechanism in the bicycle, and how such a defect *could* lead to an accident like the one experienced by T.G.

The Court will allow Mr. Macalinao to testify on matters related to his expertise, including, as outlined by Plaintiffs, the alleged defect in the braking mechanism of the bicycle and whether such a defect could lead to an accident. However, Defendants' concerns are noted, and Mr. Macalinao may not testify that any defect in the braking mechanism was, in fact, the cause of the accident in this case, as he did not see the accident occur nor does he have the requisite expertise in accident reconstruction to render an expert opinion on that issue from the other available evidence. The Court notes, however, that it does not view this as fatal to Plaintiffs' case if Plaintiffs can put forth other evidence which, when taken in combination with Mr. Macalinao's opinion, establishes that the alleged defect likely caused the accident in this case.

*References to Ready to Ride Program*
The next issue concerns evidence of or reference to the "Ready to Ride Program," which is a program through which customers of Toys "R" US can purchase pre-assembled bikes from the store. It appears that Plaintiffs intend to offer evidence of this program in support of their express warranty theory. However, it was established through discovery that where a customer purchases an unassembled bike and has that bicycle assembled by store employees—as Plaintiffs did in this case—such a customer would have not utilized the "Ready to Ride" program. As a result, Defendants believe, as does this Court, that any mention of this program would be irrelevant and could mislead the jury into thinking that an express warranty accompanied the purchase of this bicycle by virtue of a program that Plaintiffs never utilized. Accordingly, Plaintiffs are not permitted to introduce evidence relating to this program.

There is another "ready to ride" warranty issue, unrelated to the "Ready to Ride" program referred to above. In their response to the motion *in limine*,

Plaintiffs cite a portion of the Toys "R" US "standard operating procedures" for assembling bicycles, which states, in relevant part, that "[a] designated team member must ensure that all assembled bikes are *ready to ride*."[2] This statement, Plaintiffs contend, is relevant to whether or not there was an express warranty from Toys "R" US, such that the bicycle was ready for use once Plaintiffs left the store with it. At this juncture, Plaintiffs are not precluded from introducing evidence containing this phrase, as long as it does not relate to the "Ready to Ride" program discussed above. As to whether such a phrase establishes a warranty, the Court need not decide that issue yet.

**\*4** *Additional testing on the bicycle*
Plaintiffs' expert, Mr. Macalinao, apparently with the assistance of Plaintiffs' counsel, performed the Consumer Product Safety Commission's (CPSC) ten pound test—which had been described by Defendants' expert described during his deposition—on the bicycle in question. Defendants take issue with any expert opinion that Mr. Macalinao may offer regarding that replication of CPSC testing because such testing was not timely disclosed to Defense counsel, in violation of Federal Rule of Civil Procedure 26. The Court agrees.

Following the deposition of Defendants' expert, Plaintiffs provided an amended interrogatory response in which they indicated that "Plaintiffs" performed the CPSC ten-pound test, as described by the defense expert. Defense counsel followed up by asking for a supplemental disclosure if, in fact, Mr. Macalinao had performed such testing. In response, Plaintiffs indicated that they were unaware of any additional reports from Mr. Macalinao and that they themselves had done the testing. Not only does such a failure to disclose violate Federal Rule of Civil Procedure 26 (a)(2)(A-B), (e),[3] but it prevented Defendants a meaningful opportunity to conduct discovery regarding such testing, and as a result, they were denied the chance to determine whether Plaintiffs' expert was trained in performing the CPSC test, whether he had conducted that test previously, whether the scale that they used during the testing was calibrated, whether the set-up of the test was appropriate, or whether any notes, results or other documentation was prepared in concert with that testing.

Furthermore, based on the pleadings and oral argument, it appears that Defense counsel was told that there were no additional reports from Mr. Macalinao and that he would not be offering additional opinions. As such the Court, pursuant to Federal Rule of Civil Procure 37, will not allow Plaintiff's expert to offer any opinions about the CPSC testing. S. States Rack And Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595 (4th Cir. 2003) ("Rule 37(c)(1) provides that a party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial ... any witness or information not so disclosed") (internal citations omitted).

*5 *In-court testing of the brake*
Defendants also ask this Court to exclude in-court testing of the bicycle by counsel, experts, parties and members of the jury.

As an initial matter, the Court has some doubt as to whether there will be sufficient evidence to conclude that the bicycle today—five years after the accident and after assembly and reassembly of the brake in question—is in the same condition as it was on the date of the accident. Additionally, it cannot be disputed that the minor Plaintiff herself is not in the same condition as she was four years ago at age 11, riding the bicycle for the first time (other than a quick spin around her driveway a year before) on a trail and on an incline. If that cannot be established, then such in-court testing to prove the function of the brake today does not meet the basic evidentiary hurdle of relevancy under Federal. Rule of Evidence 401. Barnes v. Gen. Motors Corp., 547 F.2d 275, 277 (5th Cir. 1977) ("In order for an experiment of this type to be admissible in evidence, it is not required that all the conditions shall be precisely reproduced, but they must be so nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed") (citing Illinois Central Gulf Railroad Company v. Ishee, Miss., 317 So.2d 923, 926 (Miss. 1975)). It also has the potential to be overvalued and therefore mislead the jury.

This accident occurred over four years ago, when T.G. was 11 years old. Since that time, the bicycle has apparently been stored in Plaintiffs' garage, with no indication as to whether it has been ridden or regularly maintained. Accordingly, any in-court testing may run into the problem of whether the bicycle and braking mechanism were in sufficiently similar condition and that the Plaintiff herself is sufficiently similar to how she was at age 11. It remains to be seen whether such a foundation can be established. Even if these can be established, however, the Court has other concerns outlined below.

As it relates to any testing conducted by Plaintiffs' counsel and Mr. Macalinao that was performed but not disclosed, for the reasons noted above, this testing will not be allowed in court as the Court has already disallowed testimony about such testing done prior to the trial.

With regards to inviting members of the jury to squeeze the brake lever of the bicycle and determine for themselves whether or not the force required to do so equated to ten pounds or less, the Court finds that such testing would be outside the layperson's experience and would potentially be confusing and misleading, and therefore unfairly prejudicial to the jury in violation of Federal Rule of Evidence 403. Simply because many, if not all, members of the jury may have had some experiences with riding a bicycle at some point in their lives, it does not mean that they are qualified to perform a test about the force required to squeeze a brake lever and be able to competently compare that force to a government regulation or industry standard. Jurors' past bicycle-related experiences and grip strength will likely vary, and counsel will not have the opportunity to question these jurors on pertinent matters related to that experience. Moreover, members of the jury may be inclined to value their own evaluation of the brake lever over the opinion of the testifying expert who has conducted the test many times before. Barnes, 547 F.2d at 277 ("The problem presented by the use of experiments is the danger of misleading the members of the jury who may attach exaggerated significance to the test"). Accordingly, the Court will not allow juror testing of the bicycle.

*6 With regard to Plaintiffs themselves doing in-court testing, Ms. Callahan never tested the brake lever prior to the accident, and T.G., the only witness who had tested the lever, has since indicated that she

Callahan v. Toys "R" US-Delaware, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 219371

cannot remember what pulling the lever felt like. T.G. Deposition, 52, ECF. No. 92-1. Obviously, neither is a qualified expert and it would be impermissible to allow either to testify that the state of the rear brake demonstrates a product defect. But even a lay opinion offered under Federal Rule of Evidence 701 as to the pressure required to depress the brake today compares to how it was four years ago (assuming substantial similarity can otherwise be established) has the requirement that such testimony be rationally based on a witness's own perception and the Court is not convinced that any witness's memory separated by a period of four years, without more, would provide a sufficient foundation for such testimony or be helpful to the jury.

*Statements by Plaintiffs' treating physician*

Lastly, Defendants anticipate that Plaintiffs will offer statements, made by T.G.'s treating physicians and dentists to Ms. Callahan, about any pain and sensations that T.G. was experiencing. Such statements, Defendants contend, should be prohibited as inadmissible hearsay.

"Federal Rule of Evidence 803 enumerates twenty-three distinct hearsay exceptions, under which statements are admitted regardless of whether the declarant is available as a witness." Doali-Miller v. SuperValu, Inc., 855 F. Supp. 2d 510, 513 (D. Md. 2012). Therefore, even though Plaintiff is available, and indeed likely, to testify at trial, any statements she made about her pain "will be admissible if they fall within one of the exceptions provided in Rule 803." Id.

Pursuant to "Rule 803(4), a statement that is made for —and is reasonably pertinent to—medical diagnosis or treatment and that describes medical history; past or present symptoms or sensations; their inception; or their general cause is not excluded by the rule against hearsay." Id. (internal citations omitted). This exception to the hearsay rule is "premised on the notion that a declarant seeking treatment has a selfish motive to be truthful because the effectiveness of medical treatment depends upon the accuracy of the information provided." Id. (internal citations omitted). "A statement's admissibility under Rule 803(4) is evaluated under a two-part test: (1) the declarant's motive in making the statement must be consistent with the purposes of promoting treatment; and, (2) the

content of the statement must be such as is reasonably relied on by a physician in treatment or diagnosis." Id. at 514 (internal citations omitted).

In light of these principles, and without any additional context as to the statements that will be attempted to be elicited at trial, the Court cannot categorically say whether or not such statements will run afoul of the hearsay rule or whether they will be admissible as an exception under Rule 803(4). Statements that T.G. made about her symptoms and pain could very well be admissible, as they would presumably fit within the "present symptoms or sensations" portion of Rule 803(4). Nonetheless, the Court cautions that the admissibility of such statements will likely hinge on when they were made, under what circumstances, and to whom were such statements told. Additionally, the Court notes that testimony from someone other than a treating physician, dentist, or T.G. herself, about a statement made by T.G. regarding her symptoms and/ or pain, will be evaluated as potentially being hearsay within hearsay. Jacobsen v. Towers Perrin Forster & Crosby, Inc., No. RDB–05–2983, 2008 WL 782477, at *7 (D. Md. Mar. 20, 2008) ("Hearsay within hearsay ... refers to a hearsay statement that includes within it a further hearsay statement. Such statements are subject to the same evidentiary rules as one-level hearsay statements.").

For the reasons set forth herein, Defendant's Motion *in Limine* (ECF No. 81) is GRANTED IN PART, DENIED IN PART, AND DEFERRED IN PART.

**\*7 The issue of alleged product misuse**

Though not raised by either of the parties directly, the Court wants to give the parties guidance on the issue of alleged product misuse, to include an alleged failure to follow instructions.

In Maryland, misuse of the product, including a failure to use the product in the manner instructed, has several potential uses in a products liability case. Most commonly, this defense arises in the context of an alleged design defect. Ellsworth v. Sherne Lingerie, Inc., 495 A.2d 348 (Md. 1985) (failure to use fabric meeting certain flammability standards in design of nightgown); Simpson v. Standard Container Co., 527 A.2d 1337 (Md. App. 1987) (failure of design to include childproof cap); Lightolier, A Div. of Genlyte

Callahan v. Toys "R" US-Delaware, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 219371

Thomas Grp., LLC v. Hoon, 876 A.2d 100 (Md. 2005) (failure to incorporate appropriate thermal cut-off in design of lighting fixture). In such cases, a finding that the product was used in a manner that was not reasonably foreseeable or that it was used on contravention of written instructions or warnings can negate a finding of defect. The theory in such cases is that the product design is not defective if the product had been used in a reasonable foreseeable way or in accordance with clear instructions. See Ellsworth, supra, at 355.

Misuse or failure to follow instructions may also be relevant on the issue of causation. For example, in the context of an alleged manufacturing defect (such as the instant case), a plaintiff's case fails if, notwithstanding the existence of a defect, the alleged injury was not caused by that defect but instead by a misuse of the product or a failure to follow instructions or warnings. Id. at 355-356. As the Maryland Court of Appeals noted by way of example in Ellsworth:

> For example, a high speed electric drill may be defective because a manufacturing defect causes it to short circuit and produce a shock during normal usage. A plaintiff who attaches a brush to that drill and in attempting to clean his teeth suffers injury to his mouth from the high speed of the brush will lose because his misuse is the sole cause of his misfortune, and the defect in the drill is not in any way related to the harm.
>
> Id.

Misuse or failure to follow instructions may also be relevant in products liability cases that include a negligence count when such misuse or failure to follow amounts to contributory negligence.[4]

In the present case, based on the proposed instructions submitted, the Court assumes misuse/failure to follow is a defense theory. That theory has several potential applications, but the Court has concerns about potential limitations in a misuse defense as applied to a manufacturing defect case. For example, the Court understands that the defense may want to contend that Plaintiffs' failure to follow the instruction —"Ensure front brakes and rear brakes are working properly"—constitutes a misuse of the product and therefore negates a finding that the brake is defective notwithstanding that the product allegedly contained such a defect. The Court has questions as to whether this would be an appropriate application of "misuse" because a bike containing a manufacturing defect in the brake would not otherwise be made nondefective by following this general instruction. Stated another way, the product would not necessarily be safe for use if the instruction was followed because it would still contain a manufacturing defect. See Simpson, supra (citing Section 402A of the Restatement (Second) of Torts).

**\*8** Assuming that the instruction itself it not so general as to render it ineffective on its face,[5] although following the instruction may in some cases lead to a discovery of the manufacturing defect so as to potential avoid injury, and may, in some circumstances, be relevant on the issues of causation and contributory negligence, such an instruction does not render the product non-defective if followed and so would seem to fall outside the reasoning of Ellsworth, Lightolier, and Simpson on the issue of the existence of a defect. By contrast, the Defense may also contend that the bike was too big for T.G. in contravention of the sizing instructions provided in the owner's manual and it was this mis-sizing (rather than any issue with the brake) that caused the injuries in the case, or that T.G. failed to otherwise adequately familiarize herself with the operation of the bicycle including how to operate the brakes. These applications of misuse to negate the element of causation would be potentially appropriate in this case if supported by sufficient evidence. Again, this also might be relevant on the issue of contributory negligence.

To be clear, the Court will still entertain argument on the misuse instruction later in the case and, of course, trial developments might have an impact on the Court's preliminary conclusions above. But the Court does have the concerns expressed above that may impact whether the instruction if given and, if given, how it is worded.

### All Citations

Not Reported in Fed. Supp., 2017 WL 219371

Callahan v. Toys "R" US-Delaware, Inc., Not Reported in Fed. Supp. (2017)

2017 WL 219371

## Footnotes

1      Defendants seek the exclusion of: evidence relating to Defendants' assets and attorneys, evidence of past discovery disputes, and evidence of recalls of other products made or sold by Defendants. Plaintiffs, however, have noted that they will not introduce evidence as to any of these. Additionally, Plaintiffs indicated at oral argument that they did not seek admission of 202 Federal cases filed against Pacific Cycle.

2      Plaintiffs do not provide a citation of where this instruction can be found in the "standard operating procedures."

3      Ace Am. Ins. Co. v. McDonald's Corp., No. CIV.A. GLR-11-3150, 2012 WL 2523883, at *2 (D. Md. June 28, 2012) ("Federal Rule of Civil Procedure 26(a)(2)(A) requires litigants to disclose the identity of any witness they may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705. Rule 26(a)(2)(B) further requires litigants to produce written reports for any witness who is retained or specially employed to provide expert testimony in the case"); see also EEOC v. Freeman, 961 F. Supp. 2d 783, 797 (D. Md. 2013), aff'd in part sub nom. E.E.O.C. v. Freeman, 778 F.3d 463 (4th Cir. 2015) ("Rule 26(e) requires that an expert report be supplemented when a party learns that in some material respect the disclosure or response is incomplete or incorrect") (internal citations omitted).

4      In an appropriate case, misuse and failure to follow might also be relevant to the issue of assumption of risk, an affirmative defense in both negligence and strict liability cases. See Ellsworth, supra, at 356.

5      See Lightolier, supra, at 111 where the Court of Appeals explained that warnings on products that are vague or otherwise difficult to understand shall not generally have the effect of barring a product liability claim when those warnings are unheeded (citing Klein v. Sears, Roebuck and Co., 608 A.2d 1276, 1282-83 (Md. App. 1992)).

---

**End of Document**          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

2012 WL 5878730
Only the Westlaw citation is currently available.
United States District Court,
E.D. Louisiana.

In re CHINESE MANUFACTURED
DRYWALL PRODUCTS
LIABILITY LITIGATION.

MDL No. 2047.
|
Nov. 21, 2012.

**Attorneys and Law Firms**

Phillip A. Wittmann, Stone, Pigman, Walther, Wittmann, LLC, New Orleans, LA, for Homebuilders and Installers Steering Committee.

Judy Y. Barrasso, Barrasso, Usdin, Kupperman, Freeman & Sarver, LLC, New Orleans, LA, for Insurer Steering Committee.

Lynn C. Greer, Richmond, VA, pro se.

Robert Murray Johnston, New Orleans, LA, pro se.

### ORDER & REASONS

ELDON E. FALLON, District Judge.

 **\*1** Before the Court are four related Motions arising from claims by Plaintiffs–Intervenors against Defendant Interior Exterior ("INEX") and its excess insurer, Defendant North River Insurance Company ("North River"). INEX and North River each filed a Motion in Limine concerning the appropriate standard for determining the liability of a seller of a defective product.[1] Each defendant also filed a Motion in Limine to exclude evidence or argument relating to various listed topics.[2] The Court received and reviewed briefing from the parties and heard oral arguments from counsel. The Court has considered these arguments in light of the applicable law and relevant facts and now issues this Order and Reasons.

### I. Background

The North River Insurance Company is a defendant in two omnibus class action complaints in MDL 2047: *Silva v. Arch Insurance Co.,* Case No. 09–8034, and *Amato v. Liberty Mutual Insurance Co.,* Case No. 10–923. The claims against North River arise from its role as an excess insurer for Interior Exterior Building Supply, L.P. and Interior Exterior Enterprises, LLC (collectively "Interior Exterior" or "INEX"), co-defendants and suppliers of Chinese drywall, during the time period in question when Chinese drywall was sold, distributed, and installed into homes in Louisiana and other states.[3] These claims are based on the redhibition articles of the Louisiana Civil Code, which provide a remedy for buyers of defective products.[4]

In the spring of 2011, after a period of discovery, Interior Exterior and its primary insurers, Arch Insurance Co. and Liberty Mutual Insurance Co., entered into a class action settlement agreement. *See* (R. Doc. 8628–3). The Interior Exterior Class Settlement Agreement provides class members access to compensation from a fund representing the full policy limits of Arch and Liberty, as well as an assignment to pursue North River for $72,000,000 under its excess policies. *See id.* On May 13, 2011, the Court preliminarily approved the Settlement Agreement and entered a stay on the litigation of claims against the settling defendants, pending final approval of the Settlement Agreement. *See* (R. Doc. 8818). The final fairness hearing on the Settlement Agreement began on November 13, 2012. *See* (R. Doc. 14560–2).

North River declined to participate in the Interior Exterior Settlement Agreement, arguing that Interior Exterior is either: (1) not liable for the damages caused by the Chinese drywall; or (2) liable only as a good-faith seller. In either case, North River argues that its excess policy would not be reached.

Following the Interior Exterior Settlement Agreement, the Knauf Defendants, manufacturers of the majority of Chinese drywall with which Interior Exterior was involved, entered into a class settlement agreement with the Plaintiffs' Steering Committee ("PSC"). *See* (R. Doc. 12061–5). On January 10, 2012, the Court preliminarily approved the Knauf Settlement Agreement and stayed litigation against the Knauf Defendants pending final approval of the Agreement.

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

*See* (R. Doc. 12138). The finalization of the Knauf Settlement Agreement is conditioned upon the participation and contribution of homebuilders, installers, suppliers, and these entities' insurers, including North River. *See* Prospective Insurer Agreement, (R. Doc. 12061–5). North River stands by its defenses and has chosen not to participate in the Interior Exterior Settlement Agreement or the Prospective Insurer Agreement.

**\*2** On March 19, 2012, the Court lifted the stay on litigation against North River to allow discovery and to schedule several mediations and an ultimate trial against North River. (R. Doc. 13024). On May 15, 2012, a Rule 30(b)(6) deposition of North River's corporate representative took place in New Jersey. Then, on May 31, 2012, a mediation of the claims against North River occurred in Chambers. After approximately five hours of attempted mediation, it became apparent that a resolution would not be reached. *See* (R. Doc. 14558).

In June of 2012, the Court held status conferences to discuss the North River-related claims and determined that a bellwether trial would help inform the parties regarding both the liability of Interior Exterior, as the insured of North River, and also Interior Exterior's good or bad faith. The Court scheduled the bellwether trial on these issues to commence on November 26, 2012. The issue of damages will be resolved at a later date, if necessary. *See* (R. Docs.14686, 15229). On July 10, 2012, the Court met with counsel and directed each side to select six cases. The parties conducted discovery on these cases and selected the cases for the bellwether trial from this pool. The parties, having completed trial case selection, filed the instant Motions in preparation for the bellwether trial. The Court held a hearing and heard counsel's oral arguments on these and several other Motions on November 16, 2012.

## II. Defendants' Motions Regarding the Standard of Knowledge for Determining the Liability of a Seller of a Defective Product

As noted above, on November 2, 2012, North River and INEX filed Motions seeking to establish a narrow standard for determining the liability of a seller of a defective product. The nature and extent of such a seller's liability is based on the seller's knowledge of the defect, as explained further below. In essence, if the seller lacks the requisite knowledge of the defect, the seller is in good faith and liable only to refund the purchase price and interest. If however the seller has the requisite knowledge, the seller is in bad faith and responsible for full damages. The instant Motions urge that the Court require the Plaintiffs–Intervenors to demonstrate actual knowledge, or another high standard of knowledge, before finding that INEX was a bad-faith seller. Because these Motions raise substantially similar arguments, the Court will describe them individually and proceed to analyze them together.

### A. Present Motions

#### 1. North River

North River filed the present Motion seeking to exclude all testimony, documentary evidence, or argument based on any standard of knowledge for the determination of a seller's good faith that is less than actual knowledge. According to North River, the failure of the Court to enter such an instruction will result in a confused and misled jury and an inevitable retrial.

North River raises the following arguments in support of its Motion. First, North River argues that the applicable articles of the Louisiana Civil Code refer only to knowledge and that judicial interpretation of that standard to include constructive knowledge is improper.

**\*3** Second, North River notes several examples of statutes in other areas of the law in which the Louisiana legislature has employed the phrase "knew or should have known" in defining a liability standard. Because the legislature did not use those words or a similar phrase here, North River argues, the Legislature must have intended a higher standard for determination of good faith vel non in redhibition.

Third, North River argues that Louisiana's law of redhibition comprises two principles that are incompatible with a standard that includes constructive knowledge. First, the Code distinguishes between manufacturers, who are charged with knowledge of all defects in products they manufacture, and sellers, who are not so charged in general. Second, according to North River's argument, sellers have no duty to inspect

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

products for redhibitory defects prior to sale. North River argues that, when a seller cannot be presumed to know of a defect and has no duty to inspect, only proof of actual knowledge will prove the seller's bad faith.

Fourth, North River argues that, although many Louisiana appellate courts and federal courts have applied a "knew or should have known" standard, these courts committed one of several serious errors of law. Alternatively, North River argues that the majority of these courts' opinions have been abrogated by a subsequent decision of the Louisiana Supreme Court or can be distinguished from the present case.

Fifth, North River takes note of an apparently conflicting line of jurisprudence, in which courts have held sellers liable in redhibition for defects that were obvious to the seller (but not to the buyer) at the time of sale and refused to allow sellers to escape liability when they have turned a blind eye to such defects. North River argues that these cases do not represent an abrogation of the actual knowledge standard, and that they have only a narrow field of application.

### 2. INEX

INEX's First Motion in Limine Regarding the Standard in Redhibition was filed on the same day as North River's Motion discussed above. (R. Doc. 16077). As compared with North River's Motion, INEX's Motion represents a somewhat different approach to the argument for a narrower standard.

First, INEX acknowledges that "well-settled jurisprudence" applies a broader standard than actual knowledge in redhibition claims. INEX argues however that these decisions represent an exception to the actual knowledge standard, and a narrow exception at that, rather than a broadening of the standard. According to INEX, the "constructive knowledge exception" applies only where: (a) a seller conducts an inspection; and (b) any reasonable inspector would have discovered the defect during that inspection. Left unsaid, but implicit in INEX's argument, is that the "constructive knowledge exception" does not apply here because INEX did not conduct an inspection, or, if it did conduct an inspection, its failure to discover the defect was not the result of a failure to exercise ordinary care in performing that inspection.

**\*4** Second, INEX explicitly argues that no authority exists for imposing liability in redhibition on a seller that overlooks a suspicious condition that would have led a reasonable inspector to perform further testing, which would in turn have revealed the defect, when the relationship between the suspicious condition and the defect is unknown or a matter of dispute.

Third, INEX argues, as did North River, that a seller has no duty to inspect goods for latent or hidden defects. INEX urges the Court to prohibit Plaintiffs from presenting argument and evidence intended to impute knowledge of the defectiveness of the imported drywall based on what INEX should have known as a prudent importer or should have discovered based on reasonable inspection practices.

### 3. Plaintiffs–Intervenors' Opposition

The Plaintiffs–Intervenors (hereafter "Plaintiffs") filed a single Memorandum in Opposition to both North River's and INEX's Motions. (R. Doc. 16147). The Plaintiffs first argue that the restrictive interpretation of the knowledge standard advanced by INEX and North River ignores, and would frustrate, the underlying purpose of the redhibition action, namely protection of innocent consumers from latent or hidden defects.

Second, Plaintiffs argue that a long line of decisions, including decisions from the Louisiana Supreme Court, articulates and applies a standard that includes both actual and constructive knowledge, often employing the phrase "knew or should have known," in distinguishing between good-faith and bad-faith sellers.

Third, Plaintiffs argue that these decisions, in addressing a variety of factual circumstances, have effectively expanded the standard to include constructive knowledge, rather than carving out a limited and narrowly applied exception as Defendants suggest.

Fourth, Plaintiffs argue that the line of cases establishing seller liability for obvious or discoverable defects cannot be set aside as a matter of law in response to a motion in limine. Plaintiffs argue that the question of whether a particular defect is obvious or discoverable, and whether a seller acted reasonably

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

under the circumstances, are necessarily questions of fact to be determined at trial.

Fifth, Plaintiffs argue that INEX's assertion that liability attaches only when a seller first conducts an inspection is belied by examples of decisions that attach liability based only on what a reasonable seller would have discovered, without addressing whether or not the seller performed any inspection.

Sixth, Plaintiffs dispute Defendants' assertion that sellers owe no duty to inspect for defects under any circumstances. Plaintiffs point to the decision of an intermediate appellate court in Louisiana which identifies a burden-shifting approach, according to which, if a plaintiff first establishes that a reasonable consumer would expect a seller to conduct an inspection, the burden then falls on the seller to show either that a reasonable inspection was made or that no reasonable inspection would have revealed the defect.

### 4. INEX's Reply

**\*5** INEX filed a Reply Memorandum in response to the PSC's opposition. (R. Doc. 16260). INEX reiterates its argument for a narrow conception of a seller's duty to inspect. INEX characterizes those decisions finding such a duty as creating a "used-car exception." INEX also argues that, by allowing testimony and argument as to the nature of a seller's duty, this Court will "send sellers in Louisiana down an entirely new path, a path that requires a seller to become a de facto manufacturer and discover ... a latent defect no matter what means are required."

### B. Law & Analysis

The parties agree that the substantive law applicable to the present bellwether cases is the law of Louisiana. As noted above, the upcoming bellwether trial will address only Plaintiffs' claims in redhibition. Redhibition is codified in Louisiana Civil Code article 2520, which provides that "[t]he seller warrants the buyer against redhibitory defects, or vices, in the thing sold." This article then defines a redhibitory defect as follows:

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price. La. Civ.Code art. 2520. Redhibition also requires that "[t]he thing sold ... be reasonably fit for its ordinary use." La. Civ.Code art. 2524.

The scope of a non-manufacturer seller's damages under redhibition is based upon the seller's knowledge of the redhibitory defect. Commonly, a seller with the requisite knowledge is described as a bad-faith seller and a seller without the requisite knowledge a good-faith seller. The bad-faith seller rule is codified in article 2545 which provides, in relevant part, as follows:

A seller who knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees.

Article 2531 governs liability for a good-faith seller is Article 2531, and provides, in relevant part, as follows:

A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails to do so, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.

**\*6** As is apparent from the above description of the parties' Motions, the parties dispute what level or kind of knowledge a plaintiff must prove in order to establish that a seller was in bad faith at the time of

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

the sale of a product with a redhibitory defect. This Court's assessment of the state of Louisiana law on this point appropriately begins with the Louisiana Supreme Court's most recent in-depth explanation of the roots of the civilian concept of redhibition, which can be found in the Court's 1992 opinion in *Young v. Ford Motor Co., Inc.,* and from which an extensive quotation is warranted:

> The action of redhibition originated in Roman law to protect buyers of slaves and animals from corrupt dealers. This important aspect of our current law on sales (i.e., this system of implied warranty against latent defects and vices) was fully incorporated into Louisiana law.

> In Roman times, this doctrine originally applied primarily regarding the sale of slaves and animals, for latent defects such as diseases, tendency of the slave to run away, [and] an animal's propensity for kicking or being difficult to ride. The basic purpose of the remedy was to return the parties to their original positions: to restore the status quo. The vendor had to return the price of the goods, plus interest, and any costs that the vendee sustained in preserving the goods.

> In Louisiana Civil Code of 1808, Article 66 stated:

> The seller is bound to declare to the buyer the defects of the thing sold, as far as they are known to him, and if he does not do it, the sale shall be cancelled or the price shall be diminished according to the kind of defects, and the seller shall be liable to damages towards the buyer by the following rules.

> Article 71 of the 1808 Code stated:

> If the seller was acquainted with the defects of the thing, he is liable to all damages towards the buyer, besides the restitution of the price he may have received.

> Thus, in Louisiana the vendee was protected against vices that were not apparent at the time of the sale. The seller in good faith had only to restore the price paid and any expenses incurred, while the seller in bad faith was also liable in damages. The purpose of the redhibition action in Louisiana, as was the case in Roman law, has been to restore the status quo.

> It was in the early years of this century that this court first imputed knowledge of a product's defect to a manufacturer-vendor. This jurisprudential rule has been considered "settled" since at least 1953.

> In contrast with the Roman and civilian principles, the English doctrine of caveat emptor, foreign to the civil law, long prevailed in the common law, affording little protection at all to vendees. Gradually, the concept of "reliance" surfaced in order to enable a vendee to seek redress in a breach of warranty situation, but often only in the case of an express warranty. It was only in the 19th century that an implied warranty of merchantability found its way into the common law.

> **\*7** Thus, from a historical perspective, the civil law has always recognized and sought to remedy the problem of latent defects in goods by restoring plaintiffs to the same position they would have occupied had the redhibitory defect not caused the failed performance.

*Young v. Ford Motor Co., Inc.,* 595 So.2d 1123, 1127–28 (La.1992) (internal citations, quotation marks, and footnotes omitted).

This Court, in making its *Eerie* calculation of the state of Louisiana law, notes that the Louisiana Supreme Court has not yet definitively characterized the knowledge standard that would apply in this case, but neither has it left the question entirely open. The Court has not yet used the phrase "knew or should have known" in an opinion that also applied that standard, but it has used the phrase. *See, e.g., Spillers v. Montgomery Ward & Co.,* 294 So.2d 803, 807 (La.1974). Furthermore, the Louisiana Supreme Court has on several occasions denied writs or affirmed appellate courts that have both articulated and applied a "knew or should have known" standard. *See, e.g., Picolo v. Flex–A–Bed, Inc.,* 466 So.2d 652, 654 (La.App. 5 Cir.1985) *writ denied,* 467 So.2d 1134 (1985) ("A non-manufacturer vendor of a defective product is liable for damages ... only if he knew or should have known that the product was defective and he failed to declare the defect to the vendee."); *Coleman Oldsmobile, Inc. v. Newman & Associates, Inc.,* 477 So.2d 1155, 1158 (La.1985) *writ denied,* 481 So.2d 1334 (1986) (affirming trial court's finding that proof of repairs to an engine did not suffice to

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

demonstrate that the seller "should have been aware of the alleged redhibitory defects at the time of sale"); *Harris v. Atlanta Stove Works, Inc.,* 428 So.2d 1040, 1043 (La.App. 1 Cir.1983) *writ denied,* 434 So.2d 1106 (1983) ("A non-manufacturer seller of a defective product is responsible for damages ... only if he knew or should have known that the product sold was defective, and failed to declare it."); *Lacey v. Baywood Truck & Machinery,* 381 So.2d 863, 866 (La.App. 1 Cir.1980), *aff'd sub nom. Capital Bank and Trust Co. v. Lacey,* 393 So.2d 668 (1981) (affirming trial court's award of attorney's fees even though the plaintiff did not prove actual knowledge because the seller conducted an extensive overhaul of the truck prior to sale).[5]

This Court therefore conforms to the great weight of authority in declaring that a "knew or should have known" standard will govern this bellwether trial. As to the subsidiary disputes over the existence and extent of a seller's duty to inspect goods manufactured by another, a reasonableness standard governs. Reviewing courts are unanimous that sellers owe no general duty to inspect for hidden defects, but the absence of a general rule does not indicate that sellers never owe a duty to inspect under any circumstances. *See, e.g., Kelley v. Price–Macemon, Inc.,* 992 F.2d 1408, 1414 (5th Cir.1993); *Harris,* 428 So.2d at 1043. To the contrary, courts have held sellers liable when the circumstances dictated that a reasonable seller would have discovered the defect, whether because the defect was obvious or apparent, or because a reasonable seller would have conducted an inspection or otherwise acted in a way that would have revealed the defect. *See Boos v. Benson Jeep–Eagle Co.,* 98–1424 (La.App. 4 Cir. 6/24/98), 717 So.2d 661, 666 *writ denied sub nom. Boos v. Benson Jeep Eagle Co.,* 98–2008 La. 10/30/98, 728 So.2d 387 ("[W]here it is reasonable to expect that an inspection was made by the [seller], the burden is on the [seller] to show that a reasonable inspection was made and no defects were discovered, or that no inspection was made but the defect was of a nature that, more probably than not, it would not have been discovered by such an inspection."); *Meche v. Harvey, Inc.,* 95–848 (La.App. 3 Cir. 12/6/95), 664 So.2d 855, 859 *writ denied,* 96–0084 La. 3/8/96, 669 So.2d 402 (affirming the trial court's decision to award attorney's fees where telltale signs of body repair on the vehicle

would have immediately been discovered by anyone with minimal experience); *Lacey,* 381 So.2d at 867; *Williamson v. Strange,* 323 So.2d 875, 879 (La.App. 2 Cir.1975) ("There was no constructive knowledge of the imperfections since these could not be reasonably discovered by defendant in the exercise of ordinary care.").

**\*8** In conclusion, the Court holds that the standard of knowledge applicable to the determination of INEX's good or bad faith is as follows: INEX was in good faith if, at the time of the sale, it did not know, and a reasonable seller in its position would not have known, of the defect in the drywall. If at the time of the sale INEX actually knew of the defect, should have known of the defect based on actions it in fact took, or committed an unreasonable act or omission without which the defect would have been revealed, INEX was in bad faith. The parties' remaining disputes, including whether the defect in the drywall sold by INEX was "apparent" or "hidden," and including whether INEX committed unreasonable acts or omissions that allowed the defect to remain undiscovered, are issues of fact to be resolved by the jury.

### III. Defendants' Motions Urging Exclusion of Evidence and Argument on Listed Topics
These Motions filed on behalf of Defendants seek to exclude certain evidence from the upcoming bellwether trial. (R. Docs.16075, 16084). Plaintiffs filed an opposition to each motion. (R. Docs.16155, 16156). For the sake of simplicity and brevity, the Court will address each topic individually by describing the Defendants' argument for exclusion, the describing the Plaintiffs' counter-argument, if any, and discussing the Court's ruling.

#### A. Present Motions

*1. North River*
North River filed its second Motion in Limine seeking exclusion of testimony and evidence related to various listed topics. (R. Doc. 16075). Many of the topics, though not all, relate to the knowledge standard either directly or indirectly.

North River first argues that, as a matter of law, INEX had no duty to inspect the drywall it sold. The

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to INEX's duty to inspect.

Second, North River argues that INEX's quality control procedures are irrelevant because the defect is not observable. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to INEX's quality control procedures or lack thereof.

Third, North River argues that a "should have known" standard is inappropriate. The Court has resolved this question by articulating the governing knowledge standard.

Fourth, North River argues that evidence indicating that INEX sold drywall that was heavier or more brittle than domestic drywall should be excluded. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to the characteristics of the drywall INEX sold.

Fifth, North River argues that evidence indicating that certain individuals expressed to INEX a preference for domestic drywall should be excluded. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to preferences expressed by INEX's customers.

 **\*9** Sixth, North River argues that evidence indicating that some of the drywall INEX sold failed to comply with certain labeling standards should be excluded. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to the drywall's compliance with labeling standards.

Seventh, North River argues that the testimony of Johnny Odom should be excluded. The Court has previously granted North River's separately filed Motion in limine on this issue. (R. Doc. 16255).

Eighth, North River argues that evidence of any act or omission by INEX after it stopped selling defective drywall should be excluded. Plaintiffs argue

that INEX's post-sale conduct is relevant because its failure to warn its customers tends to show that INEX was willfully blind to the defect even before it stopped selling the defective drywall. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to INEX's post-sale conduct.

Ninth, North River argues that evidence indicating that INEX had no formal complaint department should be excluded. Plaintiffs argue that INEX's lack of a complaint department is relevant to its good or bad faith. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to INEX's complaint procedures or lack of a complaint department.

Tenth, North River argues that reference to or discussion of articles that appeared in trade journals after INEX stopped selling defective drywall should be excluded. Plaintiffs argue that such articles reflect facts that were known or knowable at the time INEX sold the defective drywall. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to articles appearing in trade journals after INEX stopped selling defective drywall.

Eleventh, North River argues that reference to or discussion of phosphogypsum should be excluded. Plaintiffs argue that phosphogypsum is relevant because it also represents a problem with imported drywall and because articles and news reports about phosphogypsum appeared while INEX was selling defective drywall. The Court declines to exclude in limine all references to phosphogypsum but will rule on appropriate objections at trial if necessary.

Twelfth, North River argues that reference to or discussion of the scope or cost of remediation of a home contaminated by defective drywall should be excluded. Plaintiffs argue that such discussion is relevant to show the scope of the risk disregarded by INEX. The Court agrees that the evidence is relevant under Rule 401 of the Federal Rules of Evidence, but finds that the probative value of the evidence is outweighed by other factors including the risk of unfair prejudice. Therefore, the Court will exclude

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

evidence of the scope or cost of remediation of a home contaminated by defective drywall pursuant to Rule 403 of the Federal Rules of Evidence.

**\*10** Thirteenth, North River argues that reference to or discussion of alleged bodily injuries attributable to defective drywall should be excluded. Plaintiffs argue that such discussion is relevant to show the scope of the risk disregarded by INEX. The Court agrees that the evidence may be relevant under Rule 401 of the Federal Rules of Evidence, but finds that the probative value of the evidence is outweighed by other factors including the risk of unfair prejudice. Therefore, the Court will exclude evidence of alleged bodily injuries pursuant to Rule 403 of the Federal Rules of Evidence.

Fourteenth, North River argues that reference to or discussion of any party's settlement or settlement negotiation should be excluded. Plaintiffs do not oppose this argument. The Court will therefore exclude any reference to any party's settlement or settlement negotiation.

Fifteenth, North River argues that reference to or discussion of any party's failure to settle should be excluded. Plaintiffs do not oppose this argument. The Court will therefore exclude any reference to any party's failure to settle pursuant to Rules 401 and 403 of the Federal Rules of Evidence.

Sixteenth, North River argues that reference to or discussion of Knauf's or Banner Supply's knowledge of the presence of sulphur in drywall should be excluded. Plaintiffs argue that such evidence is relevant. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to what other manufacturers and distributors of defective drywall knew.

Seventeenth, North River argues that reference to or discussion of this Court's jurisdictional rulings should be excluded. At a hearing on November 16, 2012, the Court accepted a stipulation from the parties to omit such discussion. This paragraph is thus denied as moot.

North River's eighteenth, nineteenth, and twentieth arguments seek to exclude reference to or discussion of this Court's pretrial rulings and the parties' pretrial

filings. Plaintiffs oppose a general exclusion of such references because of the possibility that these topics could become relevant. The Court will exclude evidence of the Court's pretrial rulings and parties' pretrial filings.

### 2. Interior Exterior

Interior Exterior's second Motion also lists several topics regarding which it seeks to exclude evidence and testimony. (R. Doc. 16084). As with North River's Motion, many but not all of the topics relate to the appropriate knowledge standard discussed above. The Court's description of INEX's Motion will omit those paragraphs that duplicate arguments made by North River.

INEX argues first that any evidence of, or argument relating to, INEX as an "importer" should be excluded. Plaintiffs argue that INEX's role as an importer establishes its place in the redhibition liability scheme. The Court has resolved this question by articulating the governing knowledge standard. The Court will not exclude evidence or argument relating to INEX's status as an importer.

**\*11** Second, INEX argues that any evidence of, or argument relating to, reports of problems with other products manufactured in China, including lead-based paint in toys, should be excluded. The Court agrees that the evidence is relevant under Rule 401 of the Federal Rules of Evidence, but finds that the probative value of the evidence is outweighed by other factors including the risk of unfair prejudice. Therefore, the Court will exclude evidence of reports of problems with other products manufactured in China pursuant to Rule 403 of the Federal Rules of Evidence.

### IV. Conclusion

For the foregoing reasons, **IT IS ORDERED** that: (1) North River's Motion in Limine Concerning Standard for Good Faith Seller's Knowledge (R. Doc. 16074) is **DENIED;** (2) INEX's First Motion in Limine Regarding the Standard in Redhibition (R. Doc. 16077) is **DENIED;** (3) the second Motion in Limine filed on behalf of North River (R. Doc. 16075) is **GRANTED IN PART AND DENIED IN PART;** and (4) INEX's Second Motion in Limine Regarding Irrelevant and/or

In re Chinese Manufactured Drywall Products Liability Litigation, Not Reported in...

2012 WL 5878730

Prejudicial Evidence (R. Doc. 16084) is **GRANTED IN PART AND DENIED IN PART.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5878730

Footnotes

1    These Motions are styled as: (1) North River's Motion in Limine Concerning Standard for Good Faith Seller's Knowledge (R. Doc. 16074); and (2) INEX's First Motion in Limine Regarding the Standard in Redhibition (R. Doc. 16077).

2    These Motions are styled as: (1) Motion in Limine of the North River Insurance Company (R. Doc. 16075); and (2) INEX's Second Motion in Limine Regarding Irrelevant and/or Prejudicial Evidence (R. Doc. 16084).

3    See *In re Chinese–Manufactured Drywall Prods. Liab. Litig.,* 2012 WL 92498, at *1–2 (E.D.La. Jan. 10, 2012), for a more complete history of this matter.

4    The import, background, and application of the redhibition articles receive extensive treatment below in Section II.B.

5    The United States Court of Appeals for the Fifth Circuit has not had occasion to articulate the appropriate knowledge standard, but several courts within this Circuit have reviewed Louisiana jurisprudence and employed a "knew or should have known" standard. *See, e.g., Jackson v. Pneumatic Production Corp.,* Civ. A. 00–3615, 2001 WL 1327656 (E.D.La. Oct. 26, 2001); *Zehner v. Nordskog Indus., Inc.,* Civ. A. 92–2508, 1992 WL 233984 (E.D.La. Sept. 2, 1992); *Williams v. Toyota of Jefferson, Inc.,* 655 F.Supp. 1081, 1086 (E.D.La.1987); *but see Morris N. Palmer Ranch Co. v. Campesi,* 647 F.2d 608, 613–14 (5th Cir.1981) (affirming the district court's dismissal of a claim in the absence of evidence of actual knowledge and where the "only shred of evidence [of constructive knowledge] was an admission by [the seller] that he knew that parentage problems had occurred in some of the regions of Quebec from which he occasionally purchased cattle. This falls short of proof that Palmer knew that some of the cattle he sold to Campesi had such problems.").

---

**End of Document**        © 2021 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 33544436
Only the Westlaw citation is currently available.
United States District Court, D. Nebraska.

Mark SANFORD and
Vicki Sanford, Plaintiffs,

v.

EKTELON/PRINCE SPORTS
GROUP, INC., and UVEX
Winter Optical, Inc., Defendants.

No. 8:97CV368.
|
Nov. 5, 1999.

ORDER

BATAILLON, J.

**\*1** The matters before the Court are defendants'
motions in limine (Filing Nos. 130, 131, 132, 133, 134,
135, 136 and 137). The motions in limine include:

| | |
|---|---|
| Filing 130 - | Request to exclude evidence of contractual indemnity of UVEX as it |
| | is analogous to a liability insurer situation; |
| Filing 131 - | Request to exclude reference to defendants' foreign affiliates; |
| Filing 132 - | Request to exclude evidence of Atrospec 3000 packaging and |
| | warnings; |
| Filing 133 - | Request to exclude other products manufactured and sold by the |
| | defendants; |
| Filing 134 - | Request to exclude any other claims or lawsuits filed against the |
| | defendants; |
| Filing 135 - | Request to exclude any evidence of discovery disputes, orders, or |
| | timeliness in this case; |
| Filing 136 - | Request to exclude cumulative evidence of Dr. Whitted and Dr. Vinger |
| | with regard to the condition of Mark Sanford's eye; and |

Filing 137 -    Request to exclude evidence of or references to ANSI Z .87 or any

other ANSI industrial standards for eye protectors.

Contractual Indemnity

Defendants request this Court to exclude any evidence regarding Ektelon's relationship as a contractual indemnitee of UVEX. It appears that Ektelon and UVEX entered into an indemnification agreement in November, 1992. (Exhibit 15) Although UVEX contends that it discontinued manufacturing sports eyewear, the Indemnification Agreement remained in force, and as a consequence, Ektelon has indemnity obligations to UVEX in this lawsuit. UVEX contends that Ektelon is acting as an insurer, and therefore, no evidence of this relationship should be allowed on the issue of negligence. *Patterson v. Swan, May, Smith & Anderson,* 473 N.W2d 94, 99 (Neb.1991); *Schwartz v. Peterson,* 256 N.W.2d 681 (Neb.1977); *Kresha v. Kresha,* 344 N.W.2d 906 (Neb.1984). However, defendant points out that while liability insurance is inadmissible upon the issue of negligence, it may be admissible for proof of agency, ownership, control or bias. *Patterson, 473 N.W.2d at 99; Kresha,* 344 N.W.2d 906.

Mark and Vicki Sanford (hereinafter Sanford) contend that the Indemnification Agreement is relevant to this case. First, Sanford states that it shows evidence that the Prism and the Astrospec are the same eyewear, an assertion that is disputed by the defendants. Second, the Indemnity Agreement makes references to the quantities of "UVEX 'Astrospec' (Ektelon 'Prism') (collectively 'the eyewear') ." Sanford states that UVEX warns against use of Astrospec for sporting activities, yet it sold them to Ektelon for use in racquet sports. Third, Sanford argues that there is an admission by the parties in the Indemnity Agreement that the Prism does not meet the ASTM F803 standards, and that this admission goes to the issue of defective design, warranty, and negligence. Finally, Sanford argues that the Indemnity Agreement is relevant to what the parties knew about whether the Astrospec (Prism) would meet the applicable safety standards for racquet sports. In summary, Sanford asks this Court to find that the cases cited by defendants are inapplicable,

because the probative value and relevance outweigh any danger of unfair prejudice. *Fed.R.Evid.* 401 and 403.

*2 The Court has reviewed Sanford's Index of Evidence, Exhibit 10 (Letter of May 11, 1992); Exhibit 11 (Letter of May 14, 1992); Exhibit 12 (Letter of November 8, 1993); and Exhibit 15 (Letter dated November 20, 1992 with attached Indemnity Agreement). The Court is of the opinion that the information regarding the issues pointed out by Sanford are relevant to crucial issues in this case, and are not offered to prove that the defendants acted negligently or otherwise wrongfully. *Patterson,* 473 N.W.2d 94, 99; *Schwartz,* 256 N.W.2d 681, 683–84. I am of the opinion that the Indemnity Agreement offers independent and substantive evidence that is relevant to the issues in the lawsuit and is more probative than prejudicial under *Fed.R.Evid.* 403. I further find the evidence with regard to indemnity to be admissible in this regard. *Fed.R.Evid.* 401 and 403.

Reference to Defendants' Foreign Affiliates

Defendants state that their respective companies have current or past ownership connections to Germany, France and Italy. They contend that these connections will invoke sympathy or loyalty to the Nebraska plaintiffs and against the foreign corporations. Sanford contends that the location of individuals controlling all aspects of this product, and the decisions that occur as a result of that ownership and control, are relevant evidence in this case. Sanford further contends that evidence with regard to the size and structure of the defendants' businesses in relation to the product in this lawsuit is relevant. Sanford asks that no blanket ruling be made at this time.

The Court finds the case cited by defendants, *United States v. Bear Ribs,* 722 F.2d 420 (1983), to not be analogous to the one at hand. *Bear Ribs* was a criminal case that dealt with admissibility of irrelevant issues in the purely criminal context. In the case of *Union Electric Light & Power Co. v. Snyder Estate Co.,*

65 F.2d 297 (8th Cir.1933), the district court allowed testimony regarding stock purchases, stock earnings, and who controlled the stock. *Union Electric,* 65 F.2d 297, 303. On appeal, the Court of Appeals stated: "these inquiries threw no light upon the single issue to be tried by the jury; but it is observed the evidence was not overlooked in counsel's argument to the jury...." *Id.* The Court further stated:

> This evidence not only took the jury far from the simple issue to be tried, but it distracted their attention from that issue, and brought before them the size and wealth of plaintiff and its affiliates, and the above-quoted argument of defendants' counsel was calculated to keep fresh in the minds of the jury the size and wealth and foreign character of the plaintiff. To permit evidence of the wealth of a party litigant, except where position or wealth is necessarily involved in determining the damages sustained, is prejudicial error.

*Union Electric,* 65 F.2d 297, 303. *See also, Pevely Dairy Co. V. United States,* 178 F.2d 363, 371 (8th Cir.1949) (where court found that testimony regarding ownership of stock by foreign corporation was not pertinent to any of the issues in the lawsuit, and could have only one purpose "and that was to prejudice the jury ."); *Gearhart v. Uniden,* 781 F.2d 147 (8th Cir.1986) (where the court stated: "On retrial, however, the District Court should limit the scope of the admissible consumer-complaint evidence and prohibit references to Uniden of Japan, Taiwan, or Hong Kong similar to those made in closing argument at the original trial.") *Id.,* at 148.

**\*3** This Court finds that references to foreign affiliation in this case would be prejudicial to the defendants and such references are not relevant to the issues in this case. Therefore, defendants' motion in limine with regard to references to foreign affiliations will be granted.

## Admissibility of Packaging and Warnings

Defendants contend that the Astrospec 3000 and the Prism are separate and different eyewear. They contend that the structure is different and that different warnings accompany the Prism eyewear, as it is designed and manufactured for sports use, unlike the Astrospec 3000. Defendants state that the Astrospec 3000 insert specifically warns against use in athletic games. (Astrospec 3000 Warning, Evidence Index, Exhibit F). The Defendants request that this Court find that the Atrospec 3000 warning not be permitted into evidence as it is irrelevant and prejudicial.

Sanford contends that the Prism and Astrospec 3000 eyewear are one and the same. Dr. Vinger has also opined that he believes that they are the same. (Depo. of Dr. Paul Vinger, 85:4–7; Filing No. 125). Sanford, therefore, requests that this court allow the warnings for the Astrospec 3000 to be admitted as evidence.

The Court ruled that Dr. Vinger can testify on the issue of whether the Prism and the Astrospec 3000 are virtually the same eyewear. (Filing No. 184) If this testimony is introduced at trial, then both the warnings are relevant to the issues in the lawsuit. The prejudice, if any, to the defendants, is outweighed by the relevance of this evidence in the lawsuit. Therefore, defendants' motion in limine with regard to this issue is denied.

## Other Eyewear Products

Defendants next contend that Sanford should be prohibited from introducing any evidence regarding other eyewear products manufactured, distributed or sold by the defendants. From 1991–93 UVEX did manufacture eyewear that was used in sports activities. Prior to 1991, and subsequent to 1993, UVEX contends that it did not manufacture eyewear that was used in sports activities. Ektelon states that it sold the UVEX Prism eyewear, and now markets and sells a variety of eyewear for sports applications. Defendants contend that introducing other kinds of eyewear manufactured and sold by them would be irrelevant to the issues in the case and could be prejudicial to them.

Sanford contends that they should be allowed to introduce evidence of the UVEX Astrospec 3000 product. This Court agrees and has already ruled that such evidence is relevant and admissible.

Sanford next argues that the defendants were marketing other products that met the applicable ASTM F803 standards. These products and the written

language contained on the packaging, according to Sanford, are proof that defendants knew of the requirements for meeting the ASTM standards. Also, Sanford wants to use these products to compare to the Prism and show that the other products, but not the Prism, had a safe design.

**\*4** Sanford has not indicated to the Court what products he would like to introduce or when the products were manufactured. Based on what has been presented to this Court, the Court rules that introduction of other eyewear products, other that the UVEX as previously set forth herein, does not appear to be relevant evidence. In addition, such evidence could violate the subsequent remedial measures rule, depending upon the date of manufacture and distribution. Fed.R.Evid. 407. Therefore, this Court rules that evidence of other eyewear will not be admissible, unless at trial evidence evolves that would make these other products relevant. For example, the Court could foresee that this evidence could be used for impeachment purposes. Sanford is free to raise this issue at trial if the evidence so dictates.

Other Claims or Lawsuits Against the Defendants

Sanford served interrogatories on the defendants asking for other lawsuits involving these defendants and protective goggles. The defendants responded that there were no similar lawsuits or claims. Defendants request that this Court not admit any other lawsuits, claims or judgments into evidence in this case.

Sanford claims that defendants did not adequately answer the interrogatory in question and have refused to give him information regarding any specific claim or lawsuit. Sanford states, "A ruling on the defendants' fifth Motion in Limine cannot be made until the Court is presented with specific evidence." Sanford then requests that this Court not make a blanket ruling on this issue.

Sanford offers no evidence that any other claims or lawsuits that are relevant to this case even exist. As a consequence, the Court rules that defendants' motion in limine in this regard should be granted, and Sanford will be unable to produce evidence of other claims,

lawsuits or judgments against the defendants during the trial.

Exclusion of Discovery Disputes

Defendants anticipate that Sanford will make reference to the parties' discovery disputes, orders or timeliness of production of documents in this case. Any references to these disputes, according to defendants, would be unduly prejudicial and irrelevant. Further, they would take the jury away from its role which is to decide the issues in the lawsuit. See *Empire Gas Corp. V. American Bakeries, Co.,* 646 F.Supp. 269, 274–276 (N.D.Ill.1986).

Sanford argues that the defendants' litigation conduct is relevant to the punitive damages requested in this case. Further, Sanford contends that the evidence surrounding the process of the case may be relevant, and this Court should not rule on it until it is introduced at trial.

This Court has ruled that punitive damages will not be allowed in this case. (Filing No. _____) This Court further rules that information regarding discovery disputes in this case is not relevant, would be prejudicial, would take the jury away from the case, and will not be admissible. *Empire Gas Corp. v. American Bakeries Co.,* 646 F.Supp. 274–76. The defendants' motion in limine is granted on this issue.

Cumulative Evidence on Mark Sanford's Eye

**\*5** Defendants request that this Court not allow evidence that is cumulative with regard to the injury to Mark Sanford's eye. Both Dr. Paul Vinger and Dr. Peter Whitted are expected to testify on this issue. Sanford claims that these two doctors will testify on different subjects. Dr. Vinger, according to Sanford, will testify about the defective nature of the eyewear and how the defects caused injury to Sanford's eye. Dr. Whitted, on the other hand, will testify regarding treatment, surgeries, extent of injury and impairment, and cost of treatment.

The Court has reviewed Sanford's exhibits, Tabs 1–4, and the deposition testimony and finds that

the testimony as presented does not appear to be cumulative. Therefore, the Court finds that this motion in limine should be overruled. However, the Court further notes that if the evidence as presented at trial becomes cumulative, the defendants are free to raise this issue again.

Exclusion of ANSI Standards

Defendants request that this Court exclude any evidence or reference to American National Standards Institute (ANSI) standards for eye and face protective wear. These guidelines, and particularly ANSI Z.87, do not apply to sports. According to defendants, these standards are purely for industrial use. Defendants believe that introduction of these standards would confuse the issues, particularly with regard to the different standards between industrial eyewear and sports eyewear.

Sanford contends that the Astrospec 3000 and the Prism are the same eyewear. Sanford further suggests

that the "Z87" marking was removed from the temple piece of the Astrospec 3000 when it was sold to Ektelon as the Prism. (Plaintiffs' Index of Evidence, Tab 1). The marking indicates that the glasses are safe for industrial use only, and not for athletic activities. Sanford contends that by marking the Z.87 off the Prism, Ektelon hid the fact that the eyewear was not safe for athletic activities.

The Court finds that the evidence is relevant and probative on this issue. Therefore, the Court overrules the defendants' motion in limine on this claim.

IT IS THEREFORE ORDERED that defendants' motions in limine (Filing Nos. 130 through 137, inclusive) are hereby denied in part and granted in part as set forth in this order.

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 33544436

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.