**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

RICHARD WALKER,                                             Plaintiff,

v.            Civil Action No.: 3:20-cv-773

ALLIANCE OUTDOOR GROUP, INC.,
And
ALLIANCE OUTDOORS PRODUCTS, INC.,
d/b/a X-STAND TREESTANDS,                                   Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE DEFENDANTS' MOTION
IN LIMINE TO PRECLUDE POST-SALE EVIDENCE**

The Plaintiff, by counsel, pursuant to Rule 7 of the Local Rules, by and through his attorneys, hereby submits his Response to the Defendants' Motion in Limine to Preclude Post-Sale Evidence, and submits the following in support thereof:

I.   Design Changes Occurring in 2018-2020 Should Be Admitted Into Evidence.

It appears the defendants are arguing that design changes to the treestand that occurred in 2018 constitute "Post-Sale Evidence," and should not be admitted at trial.

The defendants changed manufacturers three times. From 2015-2016 they do not know who manufactured the steel wire rope. In 2017, Chaorui Auto Parts began manufacturing the wire steel rope. Finally, between 2018-2020 Yangzhou Superman Sporting began manufacturing the steel wire rope. See Exhibit A, Answer to Interrogatory No. 12.

At some point in 2018, with Yangzou Superman Sporting as the manufacturer, the cable system was actually modified. This is what plaintiff's expert William Dickinson has to say on the subject:

> The new design uses plastic segments with the aluminum segments. The aluminum segments are only used for the segments with the hole to secure the cable assembly to the cable supports on foot section and the seat section. All other segments are plastic.

1

> In addition some of the plastic segments are shorter. In between the 1¼ inch long aluminum segments there is a ¾ inch long plastic segment and in the area where the fixed end is attached to the cable support there are two 9/16 inch long plastic segments with the edges beveled. In general, the plastic segments will cause less wear on the wire rope and which should increase the life of the wire rope. The shorter plastic segments in conjunction with the longer aluminum segments will make the cable assembly more flexible and will reduce wear and stress on the wire rope. The short, 9/16 inch long segments with the beveled edges that have been installed in the area where Mr. Walker's cable failed will make the cable assembly more flexible, decrease the wear on the wire rope, increase the bend radius of the wire rope as it circles the tree, and will reduce stress and fatigue on the wire rope.
>
> It appears that X-Stand is aware of at least some of the problems in the design of their cable assembly and have redesigned the cable assembly to reduce the wear on the wire rope, the stress induced to the wire rope during use and the fatigue inflicted on the wire rope during use. They have not increased the design factor or factor of safety of the wire rope. The revisions introduced by X-Stand fail to increase the working load of the cable assembly resulting in a factor of safety that is inadequate and as dangerous as the original design.

See Exhibit B, Dickinson Report of August 28, 2020, Pages 17-18. That is, among other reconfigurations, the sheath surrounding the steel wire rope cable system was enlarged in the 2018-2020 product.

The defendants have testified that this change was not for safety purposes, however. While the defendants could not produce any documentation, including modified blueprints, to demonstrate these or any other changes the defendants' Rule 30(b)(6) witness, Robert Meyer, explained the change. Meyer testified that a hinge on the pivoting perimeter arms that hold the cable system in place was enlarged, which prompted a larger circumference for the perimeter arm, which then necessitated a thicker sheath so the cable system could still tuck into the perimeter arm securely. See Exhibit C, Meyer, Pages 41-45. This is of course an artful way of saying that they thickened the water-protective sheath of the cable system sometime between 2018 and 2020:

**Q:** Got you. Okay. Did that alter any aspect of the cable?

> **A:** The – the only thing it did was made a – a slightly thicker plastic coating over the cable.

<u>Id</u>. And the Company President Nathan Stieren was likewise questioned but was unaware of changes:

> **Q:** Okay. Do you know if there were any design modifications since the x-stand model was first manufactured?
>
> **A:** No.

<u>See</u> Exhibit D, Stieren Depo, Page 14. <u>But the change at issue is still not done as a measure or precaution because the defendants deny that it was done for safety considerations.</u> According to the Rule 30(b)(6) witness, it was done purely because it was the manufacturer's preference.

> **Q:** Okay. Do we – so it was that the – the manufacturing company preferred to make those changes?
>
> **A:** That's correct.
>
> **Q:** Okay. So <u>those changes didn't have anything to do with trying to fix or prevent injuries such as what happened in Mr. Walker's case?</u>
>
> **A:** <u>That's correct.</u>
>
> **Q:** Okay. Okay. That was just a preference of the manufacturing company?
>
> **A:** Yes.

<u>See</u> Exhibit C, Meyer Depo, Page 45. And:

> **Q:** Okay. What – what effect did the increased thickness have on the stand relative to safety issues?
>
> **A:** It didn't have any effect.

<u>Id.</u> at 95. And:

> **Q:** Sure. What effect in terms of safety did enlargement of the channel have on the treestand?
> **A:** As far as safety, it didn't make any difference. It was the design change that the factory wanted to use to – to – to make their manufacturing process a little bit easier.

Id. at 65-66. (Nor does any Rule 30(b)(6) witness acknowledge any other changes on the product from 2018, as identified by Dickinson supra).

The change that was implemented in 2018-2020 had nothing to do with safety considerations. The defendants' Rule 30(b)(6) witness on the topic was asked about the matter at least three times in deposition, and denied any safety considerations every time. The defendants by their own testimony were not taking any measures to remediate anything, according to the clear and unequivocal testimony of their Rule 30(b)(6) designee.[1] As such, the modification to the cable system in 2018-2020 does not constitute a remedial measure under Fed R. Evid. 407.

Accordingly, information concerning this manufacturing change done in 2018 with Yangzou Superman Sporting should be admitted into evidence. It is relevant to show a defect in design, and it is relevant to show negligent and culpable conduct, and it is relevant to show the need for better instructions. It is likewise relevant to demonstrate the defendants' knowledge and notice of the defect, inasmuch as the design change occurred in 2018, well before the recall that occurred in 2020, and probably before Mr. Walker's fall. (The defendants are unaware when in 2018 the change occurred; the plaintiff's fall occurred on October 14, 2018.) Evidence of the change is relevant to show that the defendants were aware of limitations with the thinner sheath and cable system and sought to make it safer, despite the defendants' official response to the contrary. It is relevant to show the feasibility of designing a product with a thicker water-resistant sheath.

---

[1] "Measure" is defined by Merriam-Webster as "A step planned or taken as a means to an end // e.g. 'sponsored an anti-inflation measure in the Senate." "Remedial" is "intended as a remedy."
  The defendants should not receive the benefits associated with Rule 407 or rise above their clear unequivocal testimony when they deny at least three times that the change was a remedial measure or done for safety considerations, or indeed, had any effect on safety whatsoever.

II.      The Defect Existed At The Time The Product Left Alliance's Hands.

The defendants contend that "a finder of fact must determine whether a product was defective at the time it was sold—which cannot include reference to evidence that post-dates the date of manufacture." See Defendants Mem in Support of their Motion to Preclude Post-Sale Evidence, Page 4. It seems the defendants have a concern that plaintiff intends to use the 2018 change to argue for a safety or design consideration or standard that was somehow not applicable in 2015.

To be clear, the plaintiff intends to argue that the product had a contemporaneous design defect at the time the product left the control of the defendants in 2015, as that is what is relevant to the claims. The plaintiff continues to allege that the treestand was unreasonably dangerous, and that the unreasonably dangerous condition existed when the goods left the defendants' hands. Morgen Indus. V. Vaughan, 252 Va. 60, 471 S.E.2d 489 (1986). Chestnut v. Ford Motor Co., 445 F.2d 967 (4th Cir. 1971).

The defendants cite to Anderson v. Nissan Motor Co., 139 F.3d 599 (8th Cir. 1998). This case involved a forklift that was manufactured in 1982 without operator restraint systems. The plaintiff was injured in 1990 when his forklift tipped over. The plaintiff brought claims for breach of a post-sale duty to warn and a failure to retrofit the forklift, which were dismissed because Nebraska did not recognize a post-sale duty to warn or a post-sale duty to retrofit. This is not on point; the plaintiff brings no such claims. Simply put, in the instant case, it is alleged that the defendant sold a product that was unreasonably dangerous at the time of sale, by standards applicable at the time of manufacture and sale. We are not alleging that between 2015 and 2018 the safety standards somehow changed from what they had been and continue to be.

5

The 2018 design change is relevant to show awareness of the defect two years prior to recall, to show negligent design, and to show a failure to warn (and this list is not exclusive).

### III. In any event, the Plaintiff Should Be Permitted Introduce the Design Change For Purposes of Impeachment or Cross-Examination.

Even if the Court rules that the 2018 change was not admissible, if the defendants open the door to the design change in 2018, the plaintiff should be able to cross-examine witnesses on the subject. Landis v. Jarden Corp., 5 F. Supp 3d 808, 817 (N.D. W. Va. 2014).

### IV. Conclusion

For all the reasons given herein, the plaintiff does respectfully ask this Court to Overrule the Defendants' Motion in Limine, and for entry of an Order consistent with this Motion, and for all other relief this Court deems fair.

RICHARD WALKER

By Counsel

 /s/ William B. Kilduff_____
William B. Kilduff, Esquire
VSB # 16665
Christopher L. Spinelli, Esquire
VSB # 51332
EMROCH & KILDUFF, LLP
3600 West Broad Street, Suite 700
P. O. Box 6856
Richmond, VA 23230-0856
(804) 358-1568
(804) 353-5817 (fax)
wkilduff@emrochandkilduff.com
cspinelli@emrochandkilduff.com
*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I filed the foregoing Memorandum electronically with the Clerk of Court via the Court's CM/ECF system, which caused a true and accurate copy of the same to be sent this 20th day of October, 2021 to:

>Barry B. Sutton, *Admitted Pro Hac Vice*
>Steven D. Brock, *Admitted Pro Hac Vice*
>151 South Old Woodward Ave., Ste. 200
>Birmingham, MI 48009
>Phone: (313) 965-8577 – Sutton
>Phone: (248) 988-1811 -- Brock
>bsutton@clarkhill.com
>sbrock@clarkhill.com
>
>FRITH ANDERSON + PEAKE, P.C.
>Sean C. Workowski (USB No. 36120)
>Nathan H. Schnetzler (USB No. 86437)
>29 Franklin Road, SW
>Roanoke, Virginia 24006-1240
>Telephone: (540) 772-4600
>Facsimile: (540) 772-9167
>sworkowski@faplawfirm.com
>nschnetzler@faplawfirm.com
>
>*Counsel for Defendants*

>_/s/ William B. Kilduff_____
>William B. Kilduff, Esquire
>VSB # 16665
>Christopher L. Spinelli, Esquire
>VSB # 51332
>EMROCH & KILDUFF, LLP
>3600 West Broad Street, Suite 700
>P. O. Box 6856
>Richmond, VA 23230-0856
>(804) 358-1568
>(804) 353-5817 (fax)
>wkilduff@emrochandkilduff.com
>cspinelli@emrochandkilduff.com
>*Counsel for Plaintiff*