```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE EASTERN DISTRICT OF VIRGINIA
 2                        RICHMOND DIVISION

 3    ------------------------------------

 4    RICHARD WALKER,

 5                        Plaintiff,

 6    v.                                    CIVIL ACTION NO.
                                              3:20-cv-773
 7    ALLIANCE OUTDOOR GROUP, INC.,
      and
 8    ALLIANCE OUTDOORS PRODUCTS, INC.,
      d/b/a X-STAND TREESTANDS,
 9
                          Defendants.
10
      ------------------------------------
11

12

13

14                          VIDEOTAPED

15           DEPOSITION UPON ORAL EXAMINATION

16     OF ALLIANCE OUTDOOR GROUP, INC., BY AND THROUGH

17                    KEITH D. EDBERG,

18          TAKEN ON BEHALF OF THE PLAINTIFF

19
                     Lakeville, Minnesota
20
                        May 5, 2021
21

22

23    ------------------------------------

24         KATHLEEN BEARD ADAMS, CCR, RPR, CRR

25                     Court Reporter
```

EXHIBIT D

Page 49

```
1   necessarily be visible to a consumer conducting an
2   inspection.
3       A.   I would say that's a possibility, yes.
4       Q.   Okay.  Does the inspection you have in
5   mind require a removal of the sleeve around the
6   cable?
7       A.   I don't believe so, no.
8       Q.   Okay.  Okay.  Tell me about storage and
9   maintenance requirements.  What would you consider
10  an ideal storage environment for -- for this product
11  post-purchase, once the consumer has bought it?
12      A.   Indoors would be ideal in a cool, dry
13  area.
14      Q.   So, an area without a lot of humidity?
15      A.   Correct.
16      Q.   Okay.  An area that is enclosed would
17  also be an ideal place to store it; is that right?
18      A.   Usually -- usually, yes.
19      Q.   Okay.  An area that minimizes dampness
20  would be an ideal place to store it as well; is that
21  right?
22      A.   Yes.
23      Q.   So, you say pressure -- or excuse me.  I
24  think you said temperature controlled as well.
25      A.   I did not say that.
```

Page 50

```
1       Q.   Okay.  So, temperature control is not
2   necessarily relevant -- is not -- is not one of the
3   ideal points of storage?
4       A.   It could be.
5       Q.   Okay.  So, is temperature control a -- a
6   -- a -- a -- well, scratch that.
7            All right.  Let's take a look then at
8   the recall documents in the materials that I've sent
9   over.  And those recall documents are going to start
10  on page 61.
11           MR. SPINELLI:  Can we put that up?
12           THE VIDEOGRAPHER:  (Moved head up and
13  down.)
14           MR. SPINELLI:  Okay.  That's it.
15  Perfect.
16  BY MR. SPINELLI:
17      Q.   Okay.  Do you see what it is I've --
18  that -- what it is that we've put up on the screen?
19      A.   I do.
20      Q.   Okay.  Can you tell me what that is?
21      A.   It appears to be a note that was
22  included with a set of cables sent out to purchasers
23  of the Silent Adrenaline.
24      Q.   Okay.  And do you know why this was sent
25  out?
```

Page 51

```
1       A.   Pierce FollansbeeDelong was handling
2   this at the time.  I believe he just wanted to let
3   the customers know that it -- they were giving
4   replacement cables for the stands they had purchased
5   from Sportsman's Guide.
6       Q.   All right.  And why -- do you know why
7   they were receiving the replacement cables?
8       A.   I'm not sure if this was part of the
9   recall or not, but it's associated with that.
10      Q.   Okay.  So, if it's a recall -- if it is
11  associated with the recall, they're probably not
12  sending out the same cables as were being recalled.
13  Is that a fair guess?
14           THE REPORTER:  Mr. Edberg, I can't hear
15  you.
16      A.   I'm not sure.
17  BY MR. SPINELLI:
18      Q.   Okay.  Do you know what was different
19  about the free set of replacement cables as opposed
20  to the original set of cables that were -- that were
21  sold along with the climbing stands in 2007-2018 --
22  2017-2018?
23      A.   I believe they would have been made by a
24  different manufacturer, but I'm not sure.
25      Q.   Okay.  Do you know why that would have
```

Page 52

```
1   made a difference, the fact that they were made by a
2   different manufacturer?
3       A.   I do -- I do not.
4       Q.   Okay.  Had you seen this document before
5   today?
6       A.   I have.
7       Q.   Okay.  In -- in what context?
8       A.   Mr. Delong provided this to our
9   warehouse to include with the cables.
10      Q.   Okay.
11      A.   So, I saw it at the time.
12      Q.   Okay.  Are you aware of a safety recall
13  having taken place concerning the 2017 model
14  climbing treestands?
15      A.   I am somewhat aware, yes.
16      Q.   Okay.  Why did the recall happen and
17  is --
18           THE REPORTER:  Mr. Ed --
19      A.   My understanding --
20           THE REPORTER:  Mr. Edberg, I can't hear
21  you.
22      A.   My understanding is that we were
23  attempting to replace cables from the Silent
24  Adrenaline that had the potential issue of becoming
25  corroded.
```

Page 109

1  preferred option would be to go back down, dismount,
2  choose another tree; is that right?
3      A.   Yes.  That would probably be the
4  preferred option.
5      Q.   Okay.  You'd agree with me that
6  sometimes something that you don't think is an
7  obstacle from ground level becomes an obstacle or
8  you realize becomes -- is an obstacle once you're --
9  once you're up in a tree; right?  That can happen on
10 occasion; right?
11     A.   I guess it's possible, yes.
12     Q.   Okay.  So, going down to number 12,
13 warnings for the product in the manual and on the
14 stand itself, where are the -- where were the
15 warnings located on the product itself?
16     A.   There were several -- several warning
17 labels attached to the stand itself.
18     Q.   All right.  Let me get you to take a
19 look at -- and it'll be on page 84.
20          Okay.  So, do these look familiar to
21 you?
22     A.   They do.
23     Q.   Okay.  And, so, can you tell me what
24 they are?
25          MR. SPINELLI:  And can we back out so we

Page 110

1  can see the whole thing at one time?  I know you're
2  trying to get the language in and that's fine, but
3  let's see the whole page.  Okay.
4  BY MR. SPINELLI:
5      Q.   So, the -- the -- the question then is,
6  what -- what are the -- what are these items?
7           MR. SUTTON:  Chris, are you asking
8  generally, because I -- I know I can't read them
9  based upon what we see on screen.
10          MR. SPINELLI:  Okay.  Fair enough.
11 BY MR. SPINELLI:
12     Q.   Well, do you recognize these items?
13     A.   Yes.
14          MR. SPINELLI:  Okay.  And let's take a
15 look at 85, please.
16          All right.  Yeah.  Okay.
17 BY MR. SPINELLI:
18     Q.   And do you recognize this -- this page
19 here as well?
20     A.   Yes.
21     Q.   Okay.  So, suffice it to say that the
22 labels that we just saw a moment ago are -- are --
23 are to match up to the location points described on
24 -- on page 85; is that right?
25     A.   Correct.

Page 111

1           MR. SPINELLI:  Okay.  Now, let's go back
2  to page 84.
3  BY MR. SPINELLI:
4      Q.   And can you tell me -- and we'll
5  probably have to go close -- up close for this.
6           Can you tell me if any of these warning
7  labels actually give an expiration date of any kind
8  for any component part?
9           THE DEPONENT:  Can you go down to the
10 next three, Brendan?
11          Can you put a hold on it?
12 BY MR. SPINELLI:
13     Q.   I'm sorry.  Your ans -- you answered
14 that, but I didn't hear you.
15     A.   Well, I haven't answered yet.  I'm still
16 reading the warnings.
17          MR. SUTTON:  He said hold on.
18          MR. SPINELLI:  Oh, okay.  Thanks.
19     A.   What's that after S?
20 BY MR. SPINELLI:
21     Q.   I don't think there's anything after S.
22     A.   My answer is, no, I don't see any time
23 restriction on any of these warnings.
24     Q.   Okay.  And you don't see anything like
25 an expiration date on any of the -- on any of the

Page 112

1  products?  You don't see anything like an expiration
2  date on any of these labels; right?
3      A.   Not on these labels; correct.
4      Q.   Okay.  Do you know why there's no date
5  on the cable itself to tell you when to replace it?
6      A.   As we discussed before, we don't have a
7  expiration date for those cables.
8      Q.   Okay.  All right.  So, we have a number
9  of other accidents that were identified.  Can -- can
10 you tell me the failure mode for each of these
11 accidents?  I'm going to name the individuals and
12 just tell me what -- what you know.
13          Scott Edwards.  Do we know what the
14 failure mode was --
15          MR. SUTTON:  (Audio interruption) is
16 that what you mean?
17          Go ahead, Ed -- Edwards.  I'm sorry.
18          MR. SPINELLI:  Yeah, Scott Edwards.
19     A.   I believe that was cable separation.
20 BY MR. SPINELLI:
21     Q.   Okay.  Peter Williams?
22     A.   I don't know that one.  It's -- I don't
23 have hardly any --
24          THE REPORTER:  I'm -- I'm sorry.  I
25 can't hear the answer.

**Page 113**

1  A.  Williams I'm not familiar with. I don't
2  have enough information.
3  BY MR. SPINELLI:
4  Q.  Okay. David Clayton?
5  A.  I believe that one is cable separation.
6  Q.  Daniel Peachey?
7  A.  My understanding is that is cable
8  separation.
9  Q.  Okay. Jesse Jones?
10 A.  That one was also alleged cable
11 separation.
12 Q.  Okay. And do you know how many -- in --
13 in how many of these instances the -- the harness --
14 the safety harness was -- was not worn?
15 A.  I do not specifically know in each case,
16 no.
17 Q.  Okay. Do you know if a safety harness
18 was not worn in -- in any of the cases?
19 A.  I'm not sure.
20     MR. SPINELLI: Okay.
21     MR. SUTTON: And just to follow up on
22 that, Chris --
23     MR. SPINELLI: Yeah.
24     MR. SUTTON: -- Mr. Clayton's deposition
25 hasn't take -- hasn't been taken yet. We have -- we

**Page 114**

1  have almost no information on most of the other
2  cases, so...
3  BY MR. SPINELLI:
4  Q.  Okay. So -- so, moving on then to -- I
5  think you previously told me that there's no
6  instructions on how to inspect other than that the
7  inspections themselves should be done on the product
8  before every use; is that right?
9     MR. SUTTON: Objection to form.
10 Mischaracterizes prior testimony.
11    MR. SPINELLI: I can't hear you.
12    MR. SUTTON: Sorry. Objection to form.
13 Mischaracterizes prior testimony.
14    MR. SPINELLI: Okay. Fair enough. How
15 have I got it wrong?
16    MR. SUTTON: Well, I -- I believe he
17 said there were instructions on it, and then you
18 asked are there any diagrams and things like that.
19 He said there were no diagrams.
20    MR. SPINELLI: Okay.
21    MR. SUTTON: So --
22    MR. SPINELLI: I got you. I got you.
23 BY MR. SPINELLI:
24 Q.  All right. So, let me ask you,
25 concerning the safety harness itself, was the safety

**Page 115**

1  harness itself ever updated or modified from its
2  first development in 2013?
3  A.  It may have been. If additional or new
4  standards had been put in place, it would have had
5  to have been recertified.
6  Q.  Okay. Do you know if it was ever
7  recertified?
8  A.  I don't know that for a fact on this
9  particular model.
10 Q.  Okay. If it had been recertified, you
11 would have provided additional documentation
12 concerning that recertification; correct?
13 A.  If it had been requested for a later
14 year, then, yes, we would have provided it.
15 Q.  Okay. You mean requested for a later
16 year than 2013?
17 A.  Than for -- than for the model harness
18 that was in effect for the 2015 stand, meaning if at
19 some point the B230, which also would have been used
20 on other stands, had been updated and retested,
21 let's say in 2018, I don't know that -- if it -- if
22 it hadn't been specifically requested, I'm not sure
23 we would have provided it.
24 Q.  Okay. Well, do you -- I understand that
25 there -- that you dispute whether -- and to an

**Page 116**

1  extent it specifically has to be requested, but do
2  you have any knowledge that the safety harness was,
3  in fact, ever updated or modified?
4  A.  I do not.
5  Q.  Okay. Are you aware of any injuries
6  that were ever caused from the safety harness at
7  issue in this case?
8  A.  I assume you are referring to the
9  harness failing?
10 Q.  No. I'm -- I'm just asking if there was
11 any injuries ever caused from the safety harness at
12 use, not that it's failing or -- or otherwise.
13 A.  Not -- not -- not that I'm aware of.
14 Q.  Okay. Are you aware of any injuries
15 that -- that accrue if a person uses the harness
16 incorrectly?
17 A.  Are we still talking about this harness
18 or harnesses in general?
19 Q.  We're talking about the harness at issue
20 in this -- in this case, the harness model, the
21 B230.
22 A.  I'm not aware of any complaints, any
23 injuries, any failures.
24 Q.  Okay. Do you know how long you can hang
25 in a suspension in -- in -- in one of these